# STATE OF CONNECTICUT *v.* THOMAS J. MURPHY III
## (SC 16282)

Katz, Palmer, Sullivan, Vertefeuille and Rodriguez, Js.

Argued May 24—officially released September 12, 2000

*Michael P. Shea*, with whom was *Simon Davidson*, for the appellant (defendant).

*John A. East III*, assistant state's attorney, with whom, on the brief, were *Frank S. Maco*, state's attorney, and *Helen M. Doherty*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Thomas J. Murphy III, guilty of one count of criminal attempt to commit harassment in the second degree in violation of General Statutes §§ 53a-183 (a) (2)[1] and 53a-49,[2] and,

---

[1] General Statutes § 53a-183 (a) provides in relevant part: "A person is guilty of harassment in the second degree when . . . (2) with intent to harass, annoy or alarm another person, he communicates with a person by telegraph or mail . . . or by any other form of written communication, in a manner likely to cause annoyance or alarm . . . ."

[2] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does

subsequently, also found the defendant guilty of being a persistent offender under General Statutes § 53a-40d.[3] The trial court rendered judgment in accordance with the jury verdicts and the defendant appealed.[4] On appeal, the defendant claims that: (1) his conviction of criminal attempt to commit harassment in the second degree violated his right to free speech under the first and fourteenth amendments to the United States constitution;[5] (2) the trial court improperly failed to instruct the jury that it could not convict him on the basis of the content of his speech; and (3) the state failed to prove his guilt beyond a reasonable doubt. We reject these claims and, consequently, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant met the victim in 1990 and their

or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

[3] General Statutes § 53a-40d provides in relevant part: "(a) A persistent offender of crimes involving . . . harassment . . . is a person who (1) stands convicted of . . . harassment under section 53a-183 . . . and (2) has, within the five years preceding the commission of the present crime, been convicted of . . . a class C felony . . . .

"(b) When any person has been found to be a persistent offender of crimes involving . . . harassment . . . and the court is of the opinion that his history and character and the nature and circumstances of his criminal conduct indicate that an increased penalty will best serve the public interest, the court shall, in lieu of imposing the sentence authorized for the crime under section 53a-36, impose the sentence of imprisonment authorized by said section 53a-36 for the next more serious degree of misdemeanor . . . ."

[4] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

The first amendment right to free speech is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. E.g., *44 Liquormart, Inc.* v. *Rhode Island,* 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996).

relationship subsequently became romantic. Their relationship, however, was marked by domestic discord, and the defendant was arrested on domestic violence charges in September and December, 1994, and again in February, 1995. Ultimately, the defendant was convicted of two counts of assault in the third degree[6] stemming from those incidents of domestic violence. The defendant received a suspended sentence and was placed on probation. In addition, the defendant was ordered to attend Alcoholics Anonymous meetings and to undergo anger management training. A protective order prohibiting the defendant from contacting the victim also was issued at that time. That order later was modified at the victim's request to permit contact between the victim and the defendant. By December, 1995, however, the victim had terminated her romantic relationship with the defendant.

On January 18, 1996, the defendant entered the victim's residence without her consent and compelled her to engage in sexual intercourse. Consequently, the defendant was arrested and charged with sexual assault in the first degree,[7] among other offenses. Although, thereafter, another protective order was issued prohibiting the defendant from having any contact with the victim, the defendant, who remained incarcerated in lieu of bond pending his trial, persisted in his efforts to contact the victim by mail and telephone, often

---

[6] See General Statutes § 53a-61 (a) ("A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or (2) he recklessly causes serious physical injury to another person; or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon, a dangerous instrument or an electronic defense weapon.").

[7] See General Statutes § 53a-70 (a) ("A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . which reasonably causes such person to fear physical injury . . . .").

entreating her to drop the sexual assault charges. As a result of these contacts, the defendant was charged, in February, 1996, with violating the protective order, and, in May, 1996, with tampering with a witness. In August, 1996, the defendant was found to have violated the terms and conditions of his probation that had been imposed in connection with his third degree assault convictions.[8]

In October, 1996, the defendant pleaded guilty to sexual assault in the first degree under the *Alford* doctrine.[9] On November 15, 1996, the trial court imposed a sentence of twelve years imprisonment, suspended after five years, and ten years probation. Among the special conditions imposed upon the defendant was a prohibition against any contact with the victim or her children.[10]

Notwithstanding the court's prohibition against contact with the victim, the defendant continued to attempt to contact her by telephone and mail. On November 25, 1996, the victim received a birthday card from the defendant, which she opened and read. The victim testified that the defendant's comments in the card were alarming and offensive,[11] and that she was particularly

[8] Between January and May, 1996, the defendant mailed approximately ten letters to the victim, and called or attempted to call the victim via telephone five times.

[9] See *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[10] As part of the presentence investigation conducted in connection with the defendant's conviction for sexual assault in the first degree, the victim informed Sharon Ezzo, the defendant's probation officer, that she and her children were afraid of the defendant. She explained to Ezzo that she believed that the defendant would just "fester in prison" and would sexually assault her again once he was released. Accordingly, the victim requested that she be notified prior to the defendant's release from prison.

[11] The card provided in relevant part: "Thanks for always being there for me when I needed you the most in my life. . . . Maybe some day I can do the same for you as well. . . . Well . . . you can look at things this way, it must be nice not having to fit me into anything anymore like you used to HA. . . . I just wish this nightmare would end for everybody's sake. [D]on't you think enough is enough already . . . . Like always hang in there

upset at receiving the card so soon after the defendant had been convicted and sentenced for sexually assaulting her. The victim turned the card over to State Trooper Lynn Lewis, who had investigated the defendant's sexual assault case.

On January 6, 1997, the victim received three more letters from the defendant. The victim, having been upset by the defendant's continued attempts to contact her, and assuming that the letters contained statements similar to those in the birthday card, turned the letters over to Lewis without opening them. One of the letters, consisting of seven handwritten pages, contained two poems and a note in which the defendant complained about his misfortunes, professed his love for the victim and her children and appealed to her for help. Another letter, consisting of ten handwritten pages, was angrier in tone and repeatedly accused the victim of lying about the sexual assault and attempting to destroy the defendant's life. In one passage, the defendant wrote to the victim: "[Y]ou are afraid of what's going to happen when I get out. So you figure [you will] lie to keep me in here for as long as [you] can [sic] that's not the right answer . . . believe me. It's only going to make matters worse . . . ." The defendant later added: "[W]hat do you think is going to happen then . . . [w]hen I do get out of here after all that time."

The state filed a three count information charging the defendant with one count of harassment in the second degree and two counts of attempt to commit harassment in the second degree. The birthday card that the victim received in the mail from the defendant on November 25, 1996, provided the basis for the count of harassment in the second degree. The defendant's mailing of the seven page letter that included the two

. . . and enjoy all you can because life is short sometimes." (Emphasis in original.)

poems and the note formed the basis for one of the two counts of attempt to commit harassment in the second degree, and the mailing of the ten page letter provided the basis for the second such count. The jury acquitted the defendant of harassment in the second degree and found him guilty of the count of attempt to commit harassment in the second degree predicated on the mailing of the seven page letter. The jury could not reach a verdict on the other count of attempt to commit harassment in the second degree and, as a result, the trial court declared a mistrial as to that count.[12] The defendant appeals from the judgment of conviction rendered in accordance with the jury's verdict of guilty of attempt to commit harassment in the second degree based upon the mailing of the seven page letter to the victim.

I

The defendant first claims that the state violated his first amendment rights by "[u]nconstitutionally [applying] . . . § 53a-183 (a) (2) [t]o [his] [s]peech . . . ." Specifically, the defendant contends that his conviction was predicated upon the content of the letter that he sent to the victim rather than his conduct in using the mail to harass the victim.[13] We disagree.

The defendant concedes that his claim is unpreserved and, therefore, seeks to prevail under *State* v. *Golding*,

[12] The judgment file indicates that this count, which is not a subject of this appeal, was dismissed.

[13] Of course, some speech "falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction." *Connick* v. *Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); see also *Mozzochi* v. *Borden*, 959 F.2d 1174, 1178 (2d Cir. 1992) (mailing that "can plainly be interpreted as a threatening communication . . . is beyond the protection of the First Amendment"). For purposes of this appeal, however, we assume that the content of the defendant's letter constituted protected speech under the first amendment.

213 Conn. 233, 239–40, 567 A.2d 823 (1989),[14] and the plain error doctrine.[15] Although the record is adequate for our review of the defendant's claim, we conclude that he is not entitled to a new trial under *Golding* because he has not established a constitutional violation. We further conclude that the defendant has not demonstrated plain error because the alleged impropriety did not implicate the fairness of his trial.

General Statutes § 53a-183 (a) (2) prohibits communications by mail that are made "with intent to harass, annoy or alarm" and "in a manner likely to cause annoyance or alarm . . . ." Thus, § 53a-183 (a) (2) proscribes harassing conduct via mail and does not seek to regulate the content of communications made by mail.[16] *State* v. *Snyder*, 49 Conn. App. 617, 625, 717 A.2d 240 (1998); see also *Gormley* v. *Director, Connecticut State Dept. of Probation*, 632 F.2d 938, 942 (2d Cir.), cert. denied, 449 U.S. 1023, 101 S. Ct. 591, 66 L. Ed. 2d 485 (1980) (§ 53a-183 regulates conduct, not mere speech); *State* v. *Bell*, 55 Conn. App. 475, 481, 739 A.2d 714, cert. denied,

[14] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[15] Practice Book § 60-5, which incorporates the plain error doctrine, provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law.

"The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

[16] We note that the defendant has not challenged the constitutionality of § 53a-183 (a) (2).

252 Conn. 908, 743 A.2d 619 (1999) (same); *State* v. *Anonymous (1978-4)*, 34 Conn. Sup. 689, 696, 389 A.2d 1270 (1978) (same).

Nevertheless, in a prosecution seeking a conviction under § 53a-183, the fact finder may consider the language used in the communication in determining whether the state has proven the elements of the offense, namely, that the defendant intended to harass, annoy or alarm, and that he did so in a manner likely to cause annoyance or alarm. See *Gormley* v. *Director, Connecticut State Dept. of Probation*, supra, 632 F.2d 943; *State* v. *Bell*, supra, 55 Conn. App. 484; *State* v. *Lewtan*, 5 Conn. App. 79, 83, 497 A.2d 60 (1985); see also *Wisconsin* v. *Mitchell*, 508 U.S. 476, 489, 113 S. Ct. 2194, 124 L. Ed. 2d 436 (1993) ("[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"). Indeed, the use of such evidence may be "indispensable to a proper determination of whether the statutory requirement of intent to harass ha[s] been proven." (Internal quotation marks omitted.) *Gormley* v. *Director, Connecticut State Dept. of Probation*, supra, 943.

The state introduced a number of letters into evidence, including the letters that formed the basis of the charges against the defendant, as well as certain tape recordings and transcripts of telephone conversations between the defendant and the victim.[17] The defendant did not object to the introduction of any of these communications at trial.[18] During closing arguments, the

---

[17] The defendant does not dispute the admissibility of any of these communications.

[18] With respect to the recorded or transcribed telephone conversations that the state had introduced into evidence, the trial court charged the jury that those communications were admitted only "to show or establish the mental state of the defendant, which is one of the elements of the crime charged. The evidence may also be used . . . to identify the person who committed the crime, and you may consider it as to motive. However, motive is not an element of this crime. . . . [Y]ou may consider this evidence only on the issue of intent and for no other purpose."

prosecutor urged the jury to examine the language the defendant used in his letters and conversations with the victim to assist it in ascertaining the defendant's intent in sending the allegedly harassing letters. At no time did the prosecutor imply that the defendant should be convicted based upon the content of his communications; rather, the prosecutor argued only that those communications were evidence of the defendant's intent to harass, annoy or alarm.[19] In fact, during closing

---

[19] With respect to the content of the defendant's communications, the prosecutor made the following comments in her initial closing argument to the jury: "I want you to look very carefully at . . . the birthday card . . . and look closely at the language of that card. You are going to have to decide what it is that you believe that [the defendant] *intended when he drafted and prepared that and mailed it* to [the victim]. You are going to have to decide whether or not you think that that communication was harassing, annoying or alarming. That is your job. I am asking you . . . to do it. If you don't believe that the evidence that [was] presented here establishes beyond a reasonable doubt that [the defendant] *intended* to, in fact, harass, annoy, or alarm [the victim], then you should return a not guilty verdict . . . .

"You will also have other exhibits that are tape-recorded conversations, transcripts of those conversations. Use these . . . in coming to your conclusions *as to [the defendant's] intentions. They give you a window into his mind.*

∗ ∗ ∗

"In the course of the testimony . . . something becomes very clear. What happened was [that the defendant] communicated with [the victim] between January . . . and May of 1996. He requested her assistance. . . . She refused to do that. You have to take that information . . . and consider it carefully . . . in thinking about what you believe [the defendant] meant and *intended when he sent the letters on November 25, [1996] and the letters that were received January 6, 1997.* . . .

"Now . . . you also heard several other [tape-recorded conversations]. . . . Pay close attention to these conversations. . . . Particularly, pay attention to the conversation in April [1996, in which the defendant] learned that [the victim] changed her number to an unpublished number. I believe that that evidence is very powerful, very credible. *It gives you a very good insight into exactly what [the defendant's state of mind] was when he was drafting and communicating with [the victim] in November of [1996] and January of [1997].*" (Emphasis added.)

The prosecutor made the following remarks regarding the defendant's communications during her rebuttal closing argument: "[Defense counsel] indicated to you and brought your attention to . . . the birthday card. . . .

arguments, defense counsel also urged the jury to consider the contents of the communications to "get a flavor for all of the words" so that the jury might appreciate the benign intent of the defendant in drafting and mailing the three letters. Indeed, the defendant sought unsuccessfully to introduce into evidence the contents of an additional letter, claiming that it also was relevant to his state of mind, an issue that the defendant accurately characterized as a "central focus of [the] proceedings." Moreover, during closing arguments, defense counsel expressly urged the jury to consider the defendant's first amendment rights in evaluating the defendant's repeated requests for the victim's assistance in obtaining a sentence reduction.[20]

Finally, the trial court properly instructed the jury on the elements of attempt to commit harassment in the second degree,[21] emphasizing that the state was

---

Make sure you read [that card] carefully. . . . What do you think [the defendant] meant, ladies and gentlemen? . . . *What do you think his [in]tentions were?* . . . I think the evidence clearly shows that [the defendant] was attempting to inconvenience, annoy and alarm [the victim], but the birthday card, the letters, they speak for themselves.

\* \* \*

"[Defense counsel] also brought your attention to the tape-recorded information and argued to you what [the defendant's] interest was in [the victim] when he spoke to her. *The court will instruct you that you have to evaluate people's motivation,* what people do in the ordinary course of affairs, and if [the defendant] was attempting to manipulate, that would mean to get [the victim] to do something for him, and whether you feel he is trying to manipulate . . . ask yoursel[ves] those questions. . . .

"[Defense counsel] argued to you . . . that the communication that [the defendant] made in November [of 1996] and the communications that were received in January of [1997] were for the purpose of righting the wrong that was done. Ask . . . yourselves whether the love poems . . . [were] communicated to [the victim] to captivate [her] . . . . Ask yoursel[ves] about the love letters that we discussed . . . . [T]he letters and poems speak for themselves. *What was in [the defendant's] mind when he did that?* That is for you . . . to decide." (Emphasis added.)

[20] In her rebuttal closing argument, the prosecutor responded to defense counsel's comment by noting that the first amendment does not protect criminal *conduct.*

[21] See part II of this opinion.

required to establish that the defendant mailed the letters with the specific intent of harassing, annoying or alarming the victim. At no time did the court suggest or otherwise intimate in its instructions that the jury was free to convict the defendant based upon the content of his communications rather than his conduct in mailing the allegedly offending letters with the intent to harass, annoy or alarm.

The record, therefore, does not support the defendant's claim that his conviction under §§ 53a-183 (a) (2) and 53a-49 was predicated upon the exercise of his right to free speech. Consequently, he cannot prevail under the third prong of *State* v. *Golding*, supra, 213 Conn. 239–40. See footnote 14 of this opinion.

We also conclude that the defendant is not entitled to relief under the plain error doctrine. "The plain error doctrine of Practice Book § 60-5 requires a defendant to demonstrate that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Woods*, 250 Conn. 807, 814, 740 A.2d 371 (1999). "[W]e consistently have stated that review under the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Stephens*, 249 Conn. 288, 291, 734 A.2d 533 (1999). Because the defendant's claim under the plain error doctrine is predicated on his contention that his conviction was obtained in violation of his first amendment rights, a contention that we already have rejected, he cannot prevail on his plain error claim.

II

The defendant's second claim is related to his first: the trial court improperly failed to instruct the jury that

it could convict him only on the basis of his conduct and not the content of his speech. The defendant contends that, as a result of the trial court's omission, the jury necessarily convicted him on the basis of the content of his communications in violation of his rights under the first amendment. Because the defendant never requested such an instruction, he seeks a new trial under *State* v. *Golding,* supra, 213 Conn. 239–40,[22] and the plain error doctrine.[23] Although the record is adequate for our review of the defendant's claim, we conclude that he cannot prevail thereon because he has not demonstrated that the trial court's instruction was improper.

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . *State* v. *Denby,* 235 Conn. 477, 484–85, 668 A.2d 682 (1995). [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . *State* v. *Figueroa,* 235 Conn. 145, 170–71, 665 A.2d 63 (1995). . . . *State* v. *Delgado,* 247 Conn. 616, 625, 725 A.2d 306 (1999).

"In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instruc-

---

[22] See footnote 14 of this opinion.
[23] See footnote 15 of this opinion.

tions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995) . . . ." (Internal quotation marks omitted.) *State* v. *Albert*, 252 Conn. 795, 815–16, 750 A.2d 1037 (2000).

In its instructions to the jury, the trial court recited the text of § 53a-183 (a) (2) and properly described the elements of the crime of attempt to commit harassment in the second degree.[24] Indeed, the defendant does not claim otherwise. As we previously have indicated; see part I of this opinion; § 53a-183 (a) (2) prohibits conduct, not speech. "What is proscribed is the [mailing of the letter], with the requisite intent and in the specified manner. . . . To run afoul of the statute, [the letter] must be [mailed] not merely to communicate, but with intent to harass, annoy or alarm and in a manner likely to cause annoyance or alarm . . . ." (Citation omitted;

---

[24] The trial court instructed the jury in relevant part: "I will read the relevant parts of [§ 53a-183] to you. A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person, he communicates with a person by mail. For you to find [the defendant] guilty of this charge, the state must prove beyond a reasonable doubt that the defendant intended to harass, annoy, or alarm . . . [the victim] by communication by mail. For purposes of the statute, 'harass' means to trouble, worry, torment, and 'annoy' means to irritate, vex, bother as by a repeated action, and 'alarm' means to make suddenly afraid or anxious, frightened. The test is whether the alleged communication would be likely to cause annoyance or alarm to a person of common intelligence."

The trial court also instructed the jury on § 53a-49, the statute defining criminal attempt. See footnote 2 of this opinion. The defendant does not take issue with the trial court's instruction on § 53a-49.

internal quotation marks omitted.) *State* v. *Bell*, supra, 55 Conn. App. 480–81, quoting *Gormley* v. *Director, Connecticut State Dept. of Probation*, supra, 632 F.2d 941–42. There is nothing in the court's instructions or in the arguments of counsel that would have caused the jury to reach a contrary understanding.[25] Because the trial court's instructions with respect to § 53a-183 (a) (2) were proper in all respects, the defendant cannot prevail on his claim of instructional impropriety under *State* v. *Golding*, supra, 213 Conn. 239–40, or the plain error doctrine.

## III

The defendant also maintains that the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that he had intended to harass, annoy or alarm the victim and that he had communicated with her in a manner likely to cause annoyance or alarm. We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts estab-

---

[25] In so concluding, we do not mean to suggest that it would have been improper for the trial court to have instructed the jury *expressly* that § 53a-183 (a) (2) prohibits conduct rather than speech. Indeed, such an instruction might have been useful to emphasize that fact. We hold, rather, that the trial court's failure to give such an instruction, sua sponte, did not violate the defendant's first amendment rights.

lished by the evidence it deems to be reasonable and logical. . . .

"Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . Indeed, direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239–40, 745 A.2d 800 (2000).

The evidence revealed that the defendant had engaged in several acts of domestic violence against the victim. He was convicted of assault in the third degree stemming from that misconduct and a court had

issued a protective order prohibiting the defendant from contacting the victim. Although that order later was modified, the defendant subsequently sexually assaulted the victim by forcing her to have intercourse with him. Thereafter, another protective order was issued. The defendant nevertheless sent letters to the victim and continued to attempt to contact her by telephone.[26] In his letters, the defendant repeatedly accused the victim of being a liar and of ruining his life. The defendant also persisted in seeking to communicate with the victim after his sexual assault conviction, even though he knew that she did not want him to do so. Indeed, he sent her a birthday card just a few days after sentencing for that offense, which was followed by more letters shortly thereafter.

In light of this evidence, the jury reasonably could have concluded that, by January 6, 1997, the date on which the victim received, inter alia, the seven page letter that led to his conviction under §§ 53a-183 (a) (2) and 53a-49, the victim reasonably felt harassed, annoyed and alarmed by the defendant's repeated attempts to communicate with her despite her requests, and court orders directing, that he cease doing so.[27] The jury also reasonably could have concluded that the defendant knew that the victim's receipt of that letter would cause her to feel harassed, annoyed or alarmed, and that he mailed the letter intending to evoke such a reaction.

[26] For example, shortly after the sexual assault, the defendant telephoned the victim from prison and told her that he did not plan to plead guilty to the sexual assault charges and that he would be very angry when he was released from prison. The victim also received several additional telephone calls from the defendant in the ensuing weeks and, as a result, had her telephone number changed. After the victim changed her number, the defendant called her at her place of employment. The victim refused to provide him with her new number and reported this telephone call to State Trooper Lewis.

[27] The victim stated that she was "upset," "livid" and "furious" when she received letters from the defendant on January 6, 1997, even though she did not read them.

We conclude, therefore, that the evidence was sufficient to support the defendant's conviction for attempt to commit harassment in the second degree.

The judgment is affirmed.

In this opinion the other justices concurred.