******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

VICTOR AYALA *v.* COMMISSIONER OF CORRECTION
(AC 36739)

Lavine, Beach and Pellegrino, Js.

*Argued April 6—officially released September 8, 2015*

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J.)

*Steven B. Rasile*, assigned counsel, for the appellant (petitioner).

*Lisa Herskowitz*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Rebecca A. Barry*, assistant state's attorney, for the appellee (respondent).

*Opinion*

BEACH, J. The petitioner, Victor Ayala, appeals from the judgment of the habeas court denying his petition for habeas corpus relief. On appeal, the petitioner claims that the habeas court erred in not finding that his trial counsel provided ineffective assistance by failing to investigate and present the testimony of two witnesses. We affirm the judgment of the habeas court.

The facts regarding the petitioner's underlying conviction, as recited by this court on direct appeal, are as follows: "On November 4, 2007, the [petitioner] twice visited the apartment of the victim [Terry Weaver] and her husband [Christopher Weaver]. On the first occasion, the [petitioner] knocked on the door and the victim allowed him to enter and search her residence for his girlfriend [Marilyn Lozada, also known as Chena]. Later that night, the [petitioner] returned to the [Weavers'] residence and, unbeknownst to [the victim], waited outside, hidden from the view of the door's peephole, until the victim opened the door to get some air. When she opened the door, the [petitioner] pushed his way into the apartment and stuck what she described as a black handgun into her stomach, threatened to kill her and inquired about the whereabouts of his girlfriend. The victim informed the [petitioner] that his girlfriend was not at her residence, at which time the [petitioner] pushed her and demanded that she sit on the couch. The [petitioner] then searched the residence for his girlfriend, and when he was unable to find her, he left the residence.

"The victim then called the police to report the incident. Special weapons and tactical unit members responded to the call and searched the [Weavers'] residence. Local patrol officers also arrived on the scene and questioned the victim about the [petitioner]. She provided the officers with the [petitioner's] name and his physical description. The victim also dictated and signed a statement for the police regarding the incident. The police then searched the vicinity for the [petitioner]. After locating him, they conducted a one-on-one identification [procedure] whereby the victim was asked to look at the [petitioner] and determine if he was the person who committed the alleged crimes at her residence. The victim positively identified the [petitioner] as the individual who had entered her residence [in the early hours of] that morning.

"The [petitioner] subsequently was arrested and charged in a six count information with burglary in the second degree with a firearm in violation of [General Statutes] § 53a-102a (a), burglary in the first degree in violation of [General Statutes] § 53a-101 (a) (3), kidnapping in the second degree with a firearm in violation of [General Statutes] § 53a-94a (a), threatening in the second degree in violation of [General Statutes] § 53a-

62 (a) (1) and interfering with an officer in violation of [General Statutes] § 53a-167a (a). After the [petitioner's] arrest, the victim and her husband signed statements recanting their allegations against the [petitioner]. When questioned at trial, however, they testified that they signed those statements due to pressure from the [petitioner's] girlfriend and asserted that the victim's initial statement to the police and her husband's testimony at trial were the truthful account of the incident. After trial, the [petitioner] was convicted on all counts and was sentenced to a total effective term of fourteen years of incarceration." (Footnotes omitted.) *State* v. *Ayala*, 133 Conn. App. 514, 516–17, 36 A.3d 274, cert. denied, 304 Conn. 913, 40 A.3d 318 (2012). The petitioner's conviction was affirmed on direct appeal. Id., 526.

The petitioner filed an amended petition for a writ of habeas corpus on September 25, 2013. Following a trial, the habeas court issued a memorandum of decision denying the amended petition. The habeas court granted the petition for certification. This appeal followed.

"Our review of the judgment of the habeas court is carefully circumscribed. The underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . Whether the representation a [petitioner] received . . . was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *Vivo* v. *Commissioner of Correction*, 90 Conn. App. 167, 173, 876 A.2d 1216, cert. denied, 275 Conn. 925, 883 A.2d 1253 (2005).

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong." (Internal quotation marks omitted.) *Santaniello* v. *Commissioner of Correction*, 152 Conn. App. 583, 587–88, 99 A.3d 1195, cert. denied, 314 Conn. 937, 102 A.3d 1115 (2014). "The first component of the *Strickland* test, generally referred to as the performance prong, requires that the petitioner show that counsel's representation fell below an objective standard of reasonableness. . . . In *Strickland*, the United States Supreme Court held that [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense, after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . .

"Even if a petitioner shows that counsel's perfor-

mance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Martinez* v. *Commissioner of Correction*, 147 Conn. App. 307, 313–14, 82 A.3d 666 (2013), cert. denied, 311 Conn. 917, 85 A.3d 652 (2014). "In making [the prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or the jury. . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. . . . The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (Citation omitted; internal quotation marks omitted.) *Sanchez* v. *Commissioner of Correction*, 314 Conn. 585, 606–607, 103 A.3d 954 (2014).

The petitioner claims that the habeas court erred in finding that he failed to demonstrate that he was prejudiced by his counsel's performance. He first argues here, as he did in the habeas court, that his trial counsel was ineffective for failing to investigate and to present the testimony of two witnesses, the petitioner's brother Fernando Ayala (Fernando), and Jesus Gonzalez. The petitioner asserted that these witnesses could have provided to the jury evidence that he resided at the Weavers' apartment.[1] The petitioner argues that his residency at the scene of the crime would have defeated the element of unlawful entry, common to both burglary counts.[2] Additionally, the petitioner argues that the testimony of Gonzalez and Fernando could have served to discredit all of the Weavers' testimony.

The respondent, the Commissioner of Correction, argues that the habeas court correctly concluded that it was not reasonably probable that the testimony of Fernando and Gonzalez would have affected the outcome of the petitioner's trial.[3] The respondent argues that the testimony of Fernando and Gonzalez would have merely echoed Katherine Campbell's testimony,[4] and the jury would have found them less credible than Campbell because of kinship and criminal records.[5]

Additional facts are helpful to the resolution of this claim. The habeas court determined that at the time of the petitioner's arrest, he was found by police in a stairwell of an apartment building on Cedar Street in Meriden, a few blocks from the Weavers' apartment. He was wearing his coat inside out, and he held a bandana and a cap in his hand. When confronted by the police, the petitioner gave a false name and birth date,

denied that he had been in the Weavers' apartment building that night, and explained that he had been visiting a friend in the Cedar Street building, but could not remember the friend's name or apartment number.[6]

At the underlying criminal trial, Terry Weaver testified that Lozada had been living in the apartment in exchange for crack cocaine. According to Weaver, the petitioner occasionally stayed in the apartment with Lozada, but he did not have a key, and Lozada had vacated the apartment a few days before the incident. Trial counsel presented one defense witness at the underlying criminal trial, Campbell, the petitioner's friend. She testified at the criminal trial that she had either picked up or dropped off the petitioner in front of the Weavers' apartment building three or four times, including once about one week before the incident, but that she never entered the building herself.

Fernando testified at the habeas trial: that he frequently stopped by the Weavers' apartment to see the petitioner, sometimes unannounced; that the petitioner had a key that he used to enter the apartment;[7] that the Weavers never seemed surprised to see them; that he and the petitioner would spend time in the petitioner's bedroom; that he sometimes paid the petitioner's rent to the Weavers, in either cash or drugs; and that the last time he had picked up the petitioner from the apartment was about one and one-half days before the incident. He also testified that, although the bed and sofa in the petitioner's bedroom did not belong to the petitioner, he kept several of his possessions there, including a small television, a nightstand, clothing, and some personal items. Fernando picked up these possessions from the Weavers' apartment a few months after the petitioner's arrest. Gonzalez testified at the habeas trial that he visited the petitioner three times at the Weavers' apartment, and stayed overnight once.

The habeas court concluded that the petitioner had not met his burden to prove prejudice under *Strickland* regarding the potential testimony of Fernando and Gonzalez.[8] The court concluded that the testimony of Fernando and Gonzalez would have been only "peripherally inconsistent" with that of the Weavers. The habeas court did not explicitly find the testimony of Fernando and Gonzalez credible.[9]

We agree with the habeas court that even if the testimony of Fernando and Gonzalez had been presented at the petitioner's criminal trial, there was not a reasonable probability that the result of the proceeding would have been different; our confidence in the outcome has not been undermined. The case against the petitioner was fairly strong. The state presented two eyewitnesses, the Weavers, who knew the petitioner, called the police, positively identified him, and testified against him at trial. There was evidence that the petitioner had lied to the police and had attempted to disguise his appear-

ance at the time of his arrest.

The petitioner's putative witnesses would not have aided his defense significantly. The differences between the testimony of Fernando and Gonzalez at the habeas trial and the testimony of the Weavers and Campbell at the underlying criminal trial were minor and largely reconcilable. As the habeas court aptly stated, "Although the Weavers denied that the petitioner was given a key to their apartment, the petitioner could have received the key, or a copy, from Lozada. The visits by [Fernando and Gonzalez] to the apartment [are] compatible with the Weavers' version that the petitioner occasionally stayed at the apartment with his girlfriend." Casual permission to stay with Lozada is different from authority to enter and remain in the premises as a matter of right, and whether the petitioner had ever paid rent in some fashion is not dispositive. Neither of the putative witnesses would have established that the petitioner had the right to be on the premises at the time of the crime. Even if he had been a frequent guest, either of the Weavers or of Lozada, he was not there as a matter of right, and he could still be found guilty of burglary. See generally *State* v. *Stagnitta*, 74 Conn. App. 607, 612, 615, 813 A.2d 1033 ("To enter unlawfully means to accomplish an entry by unlawful means, while to remain unlawfully means that the initial entering of the building . . . was lawful but the presence therein became unlawful because the right, privilege or license to remain was extinguished. When either of these situations is established, the threshold element of burglary is present. . . . A *license* in real property is defined as a personal, revocable, and unassignable *privilege*, conferred either by writing or parol, to do one or more acts on land without possessing any interest therein. . . . Generally, a license to enter premises is revocable at any time by the licensor. . . . It is exercisable only *within the scope of the consent given*. . . . The phrase, licensed or privileged, as used in General Statutes § 53a-100 [b] is meant as a unitary phrase, rather than as a reference to two separate concepts." [Citations omitted; emphasis in original; internal quotation marks omitted.]), cert. denied, 263 Conn. 902, 819 A.2d 838 (2003).

Furthermore, the Weavers were cross-examined at the underlying criminal trial regarding their extensive drug use, criminal activity, and recantation of their original statements. The jury believed the Weavers' testimony. Additional testimony regarding the petitioner's residency, indirect in any event, would most likely not have swayed the jury to disbelieve the whole of the Weavers' testimony. We conclude that there is not a reasonable probability that the testimony of Fernando and Gonzalez would have altered the jury's verdict, and our confidence in the verdict is not undermined. The habeas court did not err in concluding that the petitioner was not prejudiced by his trial counsel's per-

formance.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The petitioner also argued in the habeas court that his trial counsel was ineffective for failing to investigate and to present the testimony of his girlfriend, Lozada, who could also have testified about his residency. The habeas court found that trial counsel attempted to locate Lozada personally and through an investigator, and spoke to her on the telephone. Lozada was not called as a witness at the habeas trial, and her whereabouts were unknown. The habeas court concluded that the petitioner had not met his burden to prove deficient performance or prejudice under *Strickland* regarding Lozada. The petitioner does not challenge these conclusions on appeal.

[2] The petitioner was convicted of burglary in the second degree with a firearm in violation of § 53a-102a (a), and burglary in the first degree in violation of § 53a-101 (a) (3). Burglary in the second degree with a firearm incorporates the definition of burglary in the second degree, which appears in General Statutes § 53a-102 (a) and provides: "A person is guilty of burglary in the second degree *when such person enters or remains unlawfully in a dwelling*, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein." (Emphasis added.)

Section 53a-101 (a), defining burglary in the first degree, states in relevant part: "A person is guilty of burglary in the first degree when . . . (3) such person *enters or remains unlawfully in a dwelling* at night with intent to commit a crime therein." (Emphasis added.)

[3] The habeas court did not make an express finding regarding performance. Rather, the court focused on whether there was any prejudice, that is, whether the additional evidence would have mattered.

[4] Campbell was, according to the habeas court, a "friend" of the petitioner who helped him with applications for assistance and "getting to appointments."

[5] The respondent argues for affirmance on the alternative ground that neither Fernando nor Gonzalez testified at the habeas trial that he would have testified at the criminal trial. There was testimony at the habeas trial that Fernando was in a residential drug treatment program and Gonzalez was incarcerated at the time of the petitioner's criminal trial. Testimony at trial may have implicated them in drug transactions, at a time when prosecution was not barred by a statute of limitations. The habeas court made no findings in this regard, and we decline to address the argument.

[6] The police asked the petitioner about a handgun, and the petitioner replied that it was a can opener. A search of the Cedar Street building led to the seizure of a paint can opener. No gun was ever found. *State* v. *Ayala*, supra, 133 Conn. App. 516 n.2.

[7] The habeas court found that the petitioner agreed with the testimony of Terry Weaver, that he did not have a key to the apartment.

[8] The habeas court noted that even if the petitioner had been renting a room from the Weavers on the evening of November 4, 2007, his entrance into the Weavers' bedroom would not have been lawful.

General Statutes § 53a-100 (a) provides in relevant part: "The following definitions are applicable to this part: (1) 'Building' . . . . [w]here a building consists of separate units, such as, but not limited to separate apartments, offices or rented rooms, any unit not occupied by the actor is, in addition to being a part of such building, a separate building . . . ."

According to the Weavers, the petitioner had searched their bedroom in his search for Lozada, and there was no evidence that he was authorized to enter that room.

[9] The habeas court also noted that it disbelieved the petitioner's version of events, which included the two uneventful visits to the Weavers' apartment the night of November 4, 2007, but the petitioner failed to explain why the Weavers would concoct their story, why he attempted to disguise his appearance immediately before his arrest, why he gave a false name and birth date, and why he lied to the police.